IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROSALIND SCALES,

    Plaintiff,

v.                                                                                    Case No. 2:13-CV-2175-JTM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

    Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Rosalind Scales ("Plaintiff") seeks review of a final decision by Defendant, the Commissioner of Social Security ("Commissioner"), denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. In her pleadings, Plaintiff alleges error with regard to the Commissioner's decision that Plaintiff is able to perform light work. Upon review, the court finds that the Commissioner's decision was supported by substantial evidence contained in the record. As such, the decision of the Commissioner is affirmed.

**I.     Factual and Procedural Background**

Plaintiff's medical issues seem to date back to December 2, 2006, when Plaintiff was involved in an automobile accident and subsequently began complaining of lower back pain. She first saw treating physician Dr. S.R. Reddy Katta, MD ("Dr. Katta") on December 8, 2006. Dr. Katta noted that although Plaintiff did not have any significant pain with range of motion on her cervical spine, she did display painfully limited movements of her thoracolumbar spine and

1

tenderness to palpation over her cervical paraspinal muscles. Dr. Katta recommended that Plaintiff remain out of work for two weeks. Plaintiff also underwent a very brief period of physical therapy.

The record shows that Plaintiff did not return to Dr. Katta until June 2008, when she presented with chronic lower back pain. Dr. Katta noted that Plaintiff had degenerative disc disease but no clinical evidence of lumbar radiculopathy. Dr. Katta also noted that Plaintiff was not taking any anti-inflammatory medication, as previously prescribed. Plaintiff was independent with her mobility but did display limited movement of her lumbar spine (without paraspinal muscle spasms) and localized tenderness upon palpation over her sacroiliac joint area. Dr. Katta recommended Plaintiff take her anti-inflammatory medications as prescribed and begin a regular walking or water aerobics regimen. Plaintiff returned to Dr. Katta two times over the next six months.

In January 2009, Plaintiff reported that she had returned to work as a certified nurse assistant ("CNA") several days per week. An MRI conducted during that same time indicated that Plaintiff had degenerative changes in her lower lumbar spine and congenital changes of the transverse process of her L5 vertebrae. Plaintiff underwent a consultative examination with Dr. Ira H. Fishman, DO ("Dr. Fishman"), who noted that Plaintiff put forth poor effort and slapped the examiner's hands several times during the examination. Dr. Fishman concluded that Plaintiff's examination was subjectively limited by pain in her ability to tolerate work activities; however, because of Plaintiff's uncooperativeness, Dr. Fishman was unable to gather sufficient objective physical findings to determine her specific limitations.

In February 2009, Plaintiff presented to the Providence Medical Center Emergency Room complaining of chronic back pain. She demonstrated bilateral tenderness and a moderately

limited range of motion and was diagnosed with acute lumbar strain. Plaintiff returned to Dr. Katta in March 2009 still complaining of back pain but admitting that she was doing better and officially back to work. She did not present with any gait deviation but did display limited movement of her lumbar spine and tenderness to palpation over her sacroiliac joint area. Plaintiff returned to Dr. Katta in June 2009 with a very similar evaluation.

Plaintiff's medical records then jump to June 2011,[1] when she underwent a lumbar and pelvis x-ray. The scan showed good alignment of Plaintiff's lumbar vertebrae but marked degenerative changes at the L4 vertebra and in the intervertebral space between the L4 and L5 vertebrae. Plaintiff also suffered from slight slippage at the L5 vertebra and deterioration over the S1 vertebra. A month later, Plaintiff underwent an MRI of her lumbar spine. The test revealed degenerative disc and facet changes with short pedicles, severe spinal stenosis at the L3-L4 and L4-L5 vertebrae, and a lesion on her left sacrum, which was diagnosed as a possible sclerotic bone island or lesion. A September 2011 MRI on Plaintiff's coccyx and sacrum showed marked degenerative changes without evidence of an acute fracture or subluxation.

Around this same time, Plaintiff sought treatment at the University of Kansas Hospital Comprehensive Spine Center. Staff noted that Plaintiff had a non-antalgic gait but did have a decreased range of motion of her lumbar spine with flexion, extension, and side-bending. Plaintiff was allegedly unable to bend at her waist due to the pain; however, staff noted that, prior to her examination, Plaintiff was able to bend completely over to take off her pants and put on an examination gown and did so without difficulty. Plaintiff was diagnosed with chronic low back pain, lumbar radiculitis in her right leg, muscle spasms, and core muscle weakness. A month later, in October 2011, Plaintiff presented to the Shawnee Mission Medical Center

---

[1] There are several medical records from Swope Health Wyandotte from 2009 through 2010. These records, however, are largely illegible. Dkt. 9-11; Dkt. 9-12, at 69-88.

Emergency Room complaining of moderate back pain.  Her back was non-tender and she had a normal range of motion.  Plaintiff was diagnosed with back pain.

From September 2, 2008, through November 2010, Plaintiff also underwent several physical and mental evaluations at the request of Disability Determination Services.  An April 2010 physical evaluation revealed that Plaintiff did not use an assistive device and had no difficulty getting on and off the examining table.  However, she did display mild difficulty with heel and toe walking and hopping.  Plaintiff refused to perform squatting and arising from a sitting position.

On May 13, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state agency examiner Dr. R.L. Vopat, MD ("Dr. Vopat").  Dr. Vopat concluded that Plaintiff could: (1) occasionally lift and/or carry twenty pounds, (2) frequently lift and/or carry ten pounds, (3) stand and/or walk for a total of six hours during an eight-hour workday, (4) sit for a total of six hours during an eight-hour workday, and (5) engage in unlimited pushing and pulling.  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.

On October 25, 2010, Plaintiff underwent a psychological evaluation with Dr. Karen M. Jordan, PhD ("Dr. Jordan").  Plaintiff indicated that she was currently unemployed and had been so for approximately a year after being laid off.  She stated that she was able to bathe, attend to personal grooming matters, and prepare simple meals.  Plaintiff indicated that, although she was unable to complete general housekeeping tasks, she could go grocery shopping with the help of her husband or daughter.  Plaintiff reported that she could drive without restriction but typically spent her days at home lying in bed watching television.  Dr. Jordan diagnosed Plaintiff with major depressive disorder (recurrent, moderate) without psychotic features.  Dr. Jordan also

4

concluded that Plaintiff could understand and follow directions, but that her short-term memory was below average.  Dr. Jordan diagnosed Plaintiff's ability to attend and concentrate as fair and noted that she displayed some behavior that could be potentially off-putting to others.

In November 2010, Plaintiff underwent a Psychiatric Review Technique with state examiner Dr. R.E. Schulman, PhD ("Dr. Schulman").  Dr. Schulman determined that Plaintiff suffered from major depressive disorder (recurrent, moderate).  The examiner also concluded that Plaintiff had mild restriction of her activities of daily living, moderate restriction with regard to maintaining social functioning, concentration, persistence, and pace, and no episodes of decompensation.  In a corresponding Mental Residual Functional Capacity Assessment, Dr. Schulman concluded that Plaintiff was moderately limited with regard to her ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) work in coordination with or proximity to others without being distracted by them, and (4) interact appropriately with the general public.

Plaintiff filed for DIB on January 19, 2010, alleging disability beginning September 13, 2009.  Her claim was denied initially on May 13, 2010, and upon reconsideration on November 9, 2010.  Plaintiff timely filed a request for an administrative hearing, which took place on December 19, 2011, before Administrative Law Judge Sharilyn Hopson ("ALJ Hopson").  Plaintiff, represented by counsel, appeared and testified.  Also testifying were medical expert Dr. Samuel Landau ("Dr. Landau") and Vocational Expert Alan Boroskin ("VE Boroskin").

At the hearing, Plaintiff testified that she had returned to work on April 11, 2011, as a CNA, working the night shift at a nursing home, and solely with Alzheimer's patients.  When asked why she stopped working, Plaintiff indicated that she was laid off and could not find work for approximately eighteen months.  Plaintiff indicated that she filed for unemployment benefits

during this time and stated that she was aware that, by signing her unemployment application, she was verifying that she was willing and able to work full time. When asked why she returned to work, Plaintiff stated, "[it]s called bills." Dkt. 9-4, at 78. Because of Plaintiff's full-time return to work, she amended her DIB application, seeking only a closed period of disability beginning September 13, 2009, and ending April 10, 2011.

Plaintiff gave testimony about several of her impairments, including her lower back pain, knee pain, and depression. Plaintiff testified that, when she was first laid off in September 2009, her back pain was more tolerable. She described the pain as a "stabbing, gnawing, dull ache." Dkt. 9-4, at 80. Plaintiff stated that, during the time period in question, she could stand for thirty to forty-five minutes, walk a block without difficulty, and sit for periods of time as long as she could alternate those periods with periods of standing. With regard to her activities of daily living during the closed period, Plaintiff testified that she would wake up, take care of personal hygiene needs, walk through the house and maybe wash a few dishes, fix breakfast, straighten up the house, and, once a week, do laundry. She stated that her laundry room was downstairs, which required her husband to take the clothes down for her, but Plaintiff indicated that she could make it up and down the stairs without issue as long as she went slowly. She also stated that she would walk outdoors for a bit.

When asked about her current activities of daily living, in addition to working full time, Plaintiff indicated that she can drive short distances, cook once a week, and go grocery shopping with her husband, but often has to sit down in the store. Plaintiff testified that she has some difficulty sleeping and takes "cat naps" once per day. She described her job as a challenge, but also indicated that, within her field, the job is "as easy as it gets." Dkt. 9-4, at 78.

6

In addition to Plaintiff's testimony, ALJ Hopson also sought the testimony of medical expert Dr. Landau and VE Boroskin to determine how, if at all, Plaintiff's impairments and limitations affected her ability to return to the workforce. Dr. Landau testified that, based upon the medical record, Plaintiff suffers from degenerative and congenital disease of the lumbar sacral spine, obesity, and psychiatric issues. Dr. Landau indicated that these issues were present on the alleged onset date, September 13, 2009, and continued to exist at least through the date of the administrative hearing. While the doctor indicated that the impairments, either individually or in combination, did not meet or equal a medical listing, he did state that the impairments would result in some limitation of Plaintiff's ability to function in a work setting. Dr. Landau specifically noted that Plaintiff was limited to standing and walking for only two hours out of an eight-hour workday, would need to stand and stretch for one to three minutes every hour, could carry ten pounds frequently and twenty pounds occasionally, and could only occasionally stoop and bend. While Dr. Landau concluded that Plaintiff could climb stairs, he indicated that she could not climb ladders, work at heights, or balance.

VE Boroskin described Plaintiff's past work as a CNA as semiskilled and medium in terms of exertion. Based upon Plaintiff's testimony, the conclusions of Dr. Landau, and her own review of Plaintiff's entire record, ALJ Hopson asked the VE a series of hypothetical questions that included varying degrees of limitation on actions such as standing, sitting, walking, lifting, climbing, attendance, and focus. Specifically, the ALJ recognized Plaintiff's limitation of standing and walking for only two hours out of an eight-hour workday and her need to stand and stretch as needed. Although the VE indicated that, with these restrictions, the hypothetical individual could not perform Plaintiff's past relevant work, he stated that there was other work in the national economy that an individual with such limitations could perform.

ALJ Hopson issued her decision on January 30, 2012, finding that Plaintiff suffered from a variety of severe impairments during the closed time period including degenerative and congenital disease of the lumbosacral spine, obesity, and sciatica.  Despite these findings, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  ALJ Hopson concluded that Plaintiff retained the residual functional capacity to perform light work, as that term is defined under Social Security Regulations, with the following limitations and/or exceptions: (1) only occasionally lift and/or carry twenty pounds; (2) only frequently lift and/or carry ten pounds; (3) stand and walk for a total of two hours during an eight-hour workday; (4) sit for a total of eight hours during an eight-hour workday with normal breaks every two hours and the opportunity to stand and stretch as needed, for a period of up to three minutes every hour; (5) occasionally stoop and bend; (6) climb ramps and stairs; and (7) perform moderately complex tasks.  The ALJ prohibited Plaintiff from climbing ladders, ropes, or scaffolds, balancing, and working at heights.  ALJ Hopson therefore concluded that Plaintiff was not under a disability during the closed time period from September 13, 2009, through April 10, 2011.  This decision became the final decision of the Commissioner on March 14, 2013, after the Appeals Council denied review.

On April 16, 2013, Plaintiff filed a Complaint in the United States District Court for the District of Kansas seeking reversal and the immediate award of benefits or, in the alternative, a remand to the Commissioner for further consideration.  Given Plaintiff's exhaustion of all administrative remedies, her claim is now ripe for review before this court.

## II.     Legal Standard

Judicial review of the Commissioner's decision is guided by the Social Security Act (the "Act") which provides, in part, that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The court must therefore determine whether the factual findings of the Commissioner are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion." *Barkley v. Astrue*, 2010 U.S. Dist. LEXIS 76220, at *3 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)).  The court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

An individual is under a disability only if he or she can "establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months." *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)).  This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering her age, education, and work experience." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *3 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Wilson v.*

*Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a).  The steps are designed to be followed in order.  If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4.

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those severe impairments meets or equals a designated list of impairments. *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4-5 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).  If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's residual functional capacity, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his or her past relevant work or whether he or she can generally perform other work that exists in the national economy, respectively. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5 (citing *Williams*, 844 F.2d at 751).  The claimant bears the burden in steps one through four to prove a disability that prevents performance of his or her past relevant work. *Lax*, 489 F.3d at 1084.  The burden then shifts to the Commissioner at step five to show that, despite his or her alleged impairments, the claimant can perform other work in the national economy. *Id*.

### III.     Analysis

In her assignment of error, Plaintiff argues that: (1) the ALJ mischaracterized the definition of "light work," and (2) erroneously concluded that Plaintiff could perform light work, even with her restrictions on standing and walking.  More specifically, Plaintiff alleges that her restriction to standing and/or walking for only two hours during an eight-hour workday places her ability outside the definition of light work.   Plaintiff's argument misunderstands the requirements of light work.

"Work is classified by physical exertion requirements: sedentary, light, medium, heavy, or very heavy; and the category is determined based upon the amount of physical exertion required in lifting, carrying, pushing, or pulling." *Reed v. Astrue*, 2011 U.S. Dist. LEXIS 12429, at *8-9 (D. Kan. Feb. 9, 2011) (citing 20 C.F.R. § 404.1567).  A "*full* range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, SSR LEXIS 30, at *12 (emphasis added).  However, the Social Security Regulations more fully define light work as follows:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, *or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.*

20 C.F.R. § 404.1567(b) (emphasis added).  In support of her position, Plaintiff cites to Social Security Ruling 83-10, which states, in its explanation of light work, that the "primary difference" between sedentary and *most* light jobs lies with the amount of standing or walking the job requires.  While this may be true, Plaintiff fails to cite to the immediately subsequent sentence of SSR 83-10, which states that "[a] job is also in this category [meaning light work] when it involves *sitting most of the time* but with some pushing and pulling of arm-hand or leg-

11

foot controls, which require greater exertion than in sedentary work . . . ." SSR 83-10, SSR LEXIS 30, at *14 (emphasis added). It is this latter description that best describes Plaintiff's situation.

There is no doubt that Plaintiff, during the closed period in question, was incapable of performing a full range of light work. Dr. Landau testified that Plaintiff was only capable of standing and/or walking for up to two hours during an eight-hour workday. Dkt. 9-4, at 75-76. Indeed, in her hypothetical question to the VE, ALJ Hopson included this very restriction, noting that the hypothetical individual could only "stand and/or walk two hours out of an eight hour day . . . ." Dkt. 9-4, at 87. However, Dr. Landau concluded, and the ALJ agreed, that Plaintiff's ability to lift, carry, push, and pull fit within the parameters for light work, that is "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Even given these limitations, the VE stated that there were jobs, at the light work level, that the hypothetical individual could perform, including cashier II and information clerk. Dkt. 9-4, at 88.[2]

Courts in this Circuit have long held that the testimony of a vocational expert may constitute substantial evidence upon which the ALJ may rely. However, in order to be considered substantial evidence, "the ALJ must formulate and ask hypothetical questions that 'include a full description of [the] claimant's impairments.'" *Waltemire v. Colvin*, 2014 U.S. Dist. LEXIS 105285, at *14 (D. Kan. Aug. 1, 2014) (quoting *McKitrick v. Barnhart*, 364 F. Supp. 2d 1272, 1287 (D. Kan. 2005)). An ALJ must "accept and include in the hypothetical question only those limitations supported by the record." *Id.* (quoting *McDonald v. Barnhart*, 358 F. Supp. 2d 1034, 1042 (D. Kan. 2005)). If an ALJ finds that the claimant cannot perform a

---

[2] Given the limitations on the individual's standing and walking ability, VE Boroskin did indicate that the number of positions available for these jobs would be reduced by fifty percent.

*full* range of work in a particular exertional category, she must "describe particularly and precisely the additional limitations in [her] written decisions and hypotheticals to the VE." *Id*. (citing *Vail v. Barnhart*, 84 F. App'x 1, 4-5 (10th Cir. 2003)).  Here, as noted above, ALJ Hopson specifically included Plaintiff's standing and/or walking limitation and her strength limitations in her hypothetical question to the VE.  As such, the ALJ was entitled to rely on the VE's answers with regard to what "light work" positions, if any, were available to an individual with these limitations.  As such, Plaintiff's assignment of error is without merit and is therefore dismissed.

The court pauses here to note Plaintiff's admissions that she only stopped working in 2009 because she was laid off,[3] that she did not immediately return to work because she could not find work, and perhaps most importantly, that she applied for unemployment benefits during the closed period. Dkt. 9-4, at 68.  The fact that Plaintiff stopped working seemingly for non-medical reasons suggests that her unemployment during the closed period may be unrelated to her medical conditions.  Plaintiff essentially admits as much.  Furthermore, Plaintiff's application for unemployment benefits during this time calls into question her credibility because while she represented to the Social Security Administration an inability to work during the closed period, she simultaneously represented to the labor department that she was able to work to receive unemployment benefits.  Although Plaintiff's credibility was not directly challenged in this appeal, Plaintiff's contradictory actions are still worthy of note.

---

[3] Plaintiff also admitted that she stopped working because she could not pass her certification test. Dkt. 9-8, at 21.

**IT IS THEREFORE ORDERED** this 19th day of August, 2014, that Plaintiff's appeal is hereby denied.

s/J. Thomas Marten<br>
J. THOMAS MARTEN,<br>
CHIEF JUDGE